# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTES

| | |
|---|---|
| CARLOS OLDIGS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PHILIPS NORTH AMERICA LLC, f/k/a Philips ELECTRONICS NORTH AMERICA CORPORATION, a Delaware corporation; KONINKLIJKE PHILIPS ELECTRONICS N.V., a foreign corporation; and DOES 1-50,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Carlos Oldigs ("Plaintiff"), by and through his undersigned

attorneys, brings this class action against Defendant Philips North America LLC

(f/k/a Philips Electronics North America Corporation), and Koninklijke Philips

Electronics N.V. (collectively "Philips" or "Defendant"), based on Plaintiff's

personal knowledge as to allegations pertaining to Plaintiff and on information and

belief as to all other matters, and based on an investigation by Plaintiff's Counsel,

and alleges as follows:

## INTRODUCTION

1.      This class action arises out of Philips' recall of millions of units of Philips Bi-Level Positive Airway pressure (Bi-Level PAP), Continuous Positive Airway Pressure (CPAP), and mechanical ventilator devices (the "Subject Devices").  The recall involves an estimated 3 million to 4 million devices globally, based on the company's production and shipment data.  Over half of the devices were sold in the United States, with the majority of them being the first-generation DreamStation products.  DreamStation 2 products are not affected by the recall. About 80 percent of the devices being recalled are used for treating sleep apnea, while the remaining 20 percent are ventilators.

2.      Philips has admitted that the products are defective in that they contain polyester based polyurethane foam that degrades and can be inhaled by the users, causing health risks, including respiratory issues and cancer.  Philips is advising that patients discontinue use of their devices.

3.      Philips is offering a repair and replacement program whereby the defective devices will be modified with a different foam and shipped upon as receipt of required regulatory clearances.

4.      This remedy is inadequate.  To date, the recall does not address any out-of-pocket costs incurred, and that will be incurred, by users of the Subject

CLASS ACTION COMPLAINT

Devices.  These costs include the amounts paid to purchase and service the

defective devices, and the costs to purchase replacement devices.  For many users

with breathing or apnea issues, it is not an option to simply turn in the machines

and await a replacement.   Moreover, Plaintiff and the Class would not have

purchased or leased the Subject Devices at all if they had known about the defect

in the Subject Devices.

5.      Philips' conduct is particularly reprehensible in that Philips has

known, well before the recall was announced, about problems with the foam in the

Subject Devices degrading.  Moreover, the timing of the recall announcement is

particularly curious, if not suspect, as Philips waited until the Dream Station 2

devices were released to announce the recall.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction of this action pursuant to 28

U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100

or more class members, (ii) there is an aggregate amount in controversy exceeding

$5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity

because at least one plaintiff and defendant are citizens of different states. This

CLASS ACTION COMPLAINT

Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      This Court has general and specific jurisdiction over the Defendants because Defendants have sufficient minimum contacts with this District and within this District to establish Defendants' presence here, and certain material acts upon which this suit is based occurred within this District.  Defendants do substantial business in this State and within this Judicial District.  Indeed, Philips North America is located and headquartered in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction within this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this Judicial District.  Defendant Philips North America is located and headquartered in this District.  Defendants also distribute the Subject Devices in this District and receive substantial compensation and profits from the sale and lease of the Subject Devices in this District and have and continue to conceal and make material omissions regarding the Subject Devices in this District.

## **THE PARTIES**

9.      Plaintiff is a citizen and resident of Winnebago County, Illinois.

10.     Defendant Philips North America LLC (f/k/a Philips Electronics North America Corporation) is a for-profit domestic corporation organized under Delaware law with its principal place of business at 222 Jacobs St., Cambridge, Massachusetts 02141. Philips is a wholly owned subsidiary of Philips Holding USA, Inc. Philips Holding USA, Inc. is a wholly owned subsidiary of Koninklijke Philips Electronics N.V.

11.     Defendant Koninklijke Philips Electronics N.V. is a foreign corporation with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  The company is a leader in diagnostic imaging, image-guided therapy, patient monitoring and health informatics, as well as in consumer health and home care. Philips generated 2020 sales of EUR $17.3 billion and employs approximately 77,000 employees with sales and services in more than 100 countries.

12.     Philips North America LLC and Koninklijke Philips Electronics N.V. are collectively referred to herein as "Defendant" or "Philips" unless identified separately.

13.     There exists, and at all times herein mentioned has been, a unity of ownership between Philips North America LLC and Koninklijke Philips Electronics N.V. and their agents such that any individuality or separateness

between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendant would, under the circumstances set forth in this complaint, sanction fraud or promote injustice.

14.     Upon information and belief, Koninklijke Philips Electronics N.V. communicates with Philips North America LLC and directs virtually all aspects of the Subject Devices that Philips distributes within the United States, including the quality of its Devices and appropriate repairs for pervasive defects.  Philips' decision not to disclose the Defect to Plaintiff or the Class or whether to cover repairs to the same pursuant to an extended warranty or goodwill program, was a decision made jointly by Koninklijke Philips Electronics N.V. and Philips North America LLC.  Koninklijke Philips Electronics N.V. also drafted and disseminated the press releases and updates regarding the recall notification and purports to speak and act on behalf of Philips North America LLC.

15.     On information and belief, Koninklijke Philips Electronics N.V. also oversees Philips North America LLC warranty operations, which, among other things, reviews and analyzes complaints submitted by Philips' authorized dealers in order to identify safety and performance issues with the Subject Devices. Koninklijke Philips Electronics N.V. also dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide

CLASS ACTION COMPLAINT

Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendants decide to audit the dealership.  Warranty operations collects this information, makes it available to other Philips divisions, and assists Philips in determining whether particular repairs are covered by applicable warranties or are indicative of a pervasive defect.

16.    At all times herein mentioned, Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and/or sold the Subject Devices, including the Device purchased and operated by Plaintiff.

17.    Defendants jointly design, and determine the substance of, communications to users of its Devices offered for sale at its authorized distributors or sellers, including those omitting mention of the alleged defects. Philips controls the content of these communications; its authorized distributors or sellers have no input with respect to their content.

18.    Philips developed the marketing materials to which Plaintiff and the Class were exposed, owner's manuals, informational brochures, warranty booklets,

and information included in maintenance recommendations and/or schedules for the Subject Devices, all of which fail to disclose the Defect.

19.     Philips also employs a customer service center, the representatives of which are responsible for fielding customer complaints and monitoring customer complaints posted to Philips or third-party web sites: data which informs Philips' warranty operations, and through which Philips acquires knowledge of defect trends in its products, including the Subject Devices.

20.     Philips distributes its products through a network of distributors or sellers who are agents of Philips North America LLC and Koninklijke Philips Electronics N.V.

21.     The true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by such fictitious names. Each Defendant designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of any Defendants designated herein as DOES when such identities become known.

22.     On information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each

CLASS ACTION COMPLAINT

of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

23.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips reported 80% order intake growth for patient monitors and hospital ventilators compared to Q1 2020.  Philips then reported that "Regretfully, we have identified a quality issue in a component that is used in certain sleep and respiratory care products and are initiating all precautionary actions to address this issue, for which we have taken a EUR 250 million provision."

24.    Further, as part of its "Regulator Update" in its 10Q, Philips reported that "Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are

in the first-generation DreamStation product family.  Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million."

25.    Despite the announcement regarding "possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices," Philips reported a hefty jump in quarterly profit as the coronavirus pandemic drove demand for the Company's hospital equipment and personal health appliances.  Philips reported that it "anticipates that the expected revenue headwinds in the Sleep & Respiratory Care business in 2021 will be compensated by the strength of the company's other businesses. Therefore, the full year comparable sales growth and Adjusted EBITA margin guidance provided on April 26, 2021 remains unchanged."

26.    On June 14, 2021, a month after Philips noted a "quality issue" involving CPAP machines and ventilators while touting the Company's first-quarter 2021 sales results, Philips provided an update on the "recall notification for specific Philips Bi-Level Positive Airway Pressure (Bi-Level PAP), Continuous

Positive Airway Pressure (CPAP), and mechanical ventilator devices to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices.   The majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family."

27.     In the June 14, 2021 update, Philips reported that "To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone, and high heat and high humidity environments may also contribute to foam degradation. Therefore, Philips has decided to voluntarily issue a recall notification to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken."

28.     "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are

announcing today to ensure patient safety," said Frans van Houten, CEO of Royal

Philips. "In consultation with the relevant regulatory agencies and in close

collaboration with our customers and partners, we are working hard towards a

resolution, which includes the deployment of the updated instructions for use and a

comprehensive repair and replacement program for the affected devices. Patient

safety is at the heart of everything we do at Philips." Van Houten said, "We have

seen a very low incident rate. But out of precaution we feel we need to take action

and repair affected machines and change the component."

29.    The Recall Notification stated:

*Based on the latest analysis of potential health risks and out of an*

*abundance of caution, the recall notification advises patients and customers*

*to take the following actions:*

- ***For patients using <u>affected</u> BiLevel PAP and CPAP devices:***

  *Discontinue use of your device and work with your physician or Durable*
  *Medical Equipment (DME) provider to determine the most appropriate*
  *options for continued treatment. To continue use of your device due to lack*
  *of alternatives, consult with your physician to determine if the benefit of*
  *continuing therapy with your device outweighs the risks identified in the*
  *recall notification.\**

- ***For patients using <u>affected</u> life-sustaining mechanical ventilator devices:***

CLASS ACTION COMPLAINT

*Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.*

30.     The Recall Notification also notified users of the following possible health risks: "Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.

31.     To address the issue, Philips announced a Repair and Replacement Program:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances.

Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.

32. The recalled devices include all of the following Philips CPAP

machine and ventilator units manufactured before April 26, 2021, and all serial

numbers, as listed and depicted below:

**CPAP and BiLevel PAP Devices**

**Continuous Ventilator, Minimum Ventilatory Support, Facility Use**
E30 (Emergency Use Authorization)

**Continuous Ventilator, Non-life Supporting**
DreamStation (ASV)
DreamStation (ST, AVAPS)
SystemOne (ASV4)
C Series (ASV, S/T, AVAPS)
OmniLab Advanced Plus (In-Lab Titration Device)

**Non-continuous Ventilator**
SystemOne (Q series)
DreamStation (CPAP, Auto CPAP, BiPAP)
DreamStation GO (CPAP, APAP)
Dorma 400, 500 (CPAP)
REMStar SE Auto (CPAP)

**Mechanical Ventilators**

**Continuous Ventilator**
Trilogy 100 (Ventilator)
Trilogy 200 (Ventilator)
Garbin Plus, Aeris, LifeVent (Ventilator)

**Continuous Ventilator, Minimum Ventilatory Support, Facility Use**
A-Series BiPAP Hybrid A30 (not marketed in US)
A-Series BiPAP V30 Auto (Ventilator)

**Continuous Ventilator, Non-life Supporting**
A-Series BiPAP A40 (not marketed in US)
A-Series BiPAP A30 (not marketed in US



CPAP and BiLevel PAP Devices
All Affected Devices Manufactured Before 26 April 2021, All Device Serial Numbers

Continuous Ventilator, Minimum Ventilatory Support, Facility Use



E30
(Emergency Use
Authorization)

Continuous Ventilator, Non-life Supporting




DreamStation
ASV

DreamStation
ST, AVAPS

SystemOne
ASV4

C Series
ASV, S/T, AVAPS



OmniLab Advanced
Plus
In-Lab Titration Device

CLASS ACTION COMPLAINT

**Non-continuous Ventilator**






SystemOne
(Q series)

DreamStation
CPAP, Auto CPAP, BIPAP

DreamStation GO
CPAP, APAP

Dorma 400, 500
CPAP



REMStar SE Auto
CPAP

## Mechanical Ventilators
All Affected Devices Manufactured Before 26 April 2021, All Device Serial Numbers

**Continuous Ventilator**





Trilogy 100
Ventilator

Trilogy 200
Ventilator

Garbin Plus, Aeris,
LifeVent
Ventilator

**Continuous Ventilator, Minimum Ventilatory Support, Facility Use**




A-Series BiPAP Hybrid
A30
(not marketed in US)

A-Series BiPAP V30
Auto
Ventilator

**Continuous Ventilator, Non-life Supporting**




A-Series BiPAP A40
(not marketed in US)

A-Series BiPAP A30
(not marketed in US)

33.     In the Q&A section of the Recall Notice, Philips also noted that:

CLASS ACTION COMPLAINT

**In the event of exposure to degraded foam:**

- The potential risks of degraded foam exposure include:
    - Irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects.
- To date, Philips Respironics has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask). Philips also has received reports of headache, upper airway irritation, cough, chest pressure and sinus infection.

**In the event of exposure to chemical emissions:**

- The potential risks of exposure due to chemical emissions from affected foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.
- To date, Philips has not received reports of patient impact or serious harm as a result of this issue.

34.    With respect to the "root cause" of the defect, Philips noted that

"Based on Philips analysis, the root cause of this issue is related to the sound

abatement foam currently used in specific identified products of the Sleep &

Respiratory Care portfolio."

35.    In response to the Question: 'How did this happen, and what is Philips

doing to ensure it will not happen again," Philips responded:

    Philips has a robust Quality Management System and has followed our
    review and analysis processes to help identify and address this issue.

CLASS ACTION COMPLAINT

The products were designed according to, and in compliance with, appropriate standards upon release. As new standards are developed, they require assessment of product characteristics according to quality and regulatory processes. Philips Quality Management System has been updated to reflect these new requirements.

However, while standards have been updated, products developed on the prior standard are still in compliance with medical device regulations. The foam degradation and chemical emission issues were discovered as part of our Quality Management System processes and are being corrected in accordance with appropriate regulatory requirements.

Philips has been in full compliance with relevant standards upon product commercialization.

36.    In response to the Questions whether new patients will be set up with devices and whether existing patient devices that fail will be replaced, Philips responded:

At this time, Philips is unable to set up new patients on affected devices. Philips may work with new patients to provide potential alternate devices.

Philips may repair / replace ventilator units that patients are reliant on in emergency situations such as device failure during required treatment, to ensure continuity of care.

Philips CPAPs cannot be replaced during ship hold.

37.    Despite the recall, Philips has not come close to compensating Class members for their out-of-pocket expenses due to the defect. These expenses include, but are not limited to: amounts paid or co-paid to purchase or lease the

Subject Devices; amounts expended to purchase or lease replacement devices; amounts paid for replacement parts, filters, and maintenance on the Devices.

38.     Philips' conduct is particularly reprehensible in that Philips has known about problems with the foam in the Subject Devices degrading and breaking down, well before the recall was announced.  For years, consumers have been complaining about the presence of debris and black particles in the humidifier and airpath circuit of the Subject Devices, which is a symptom of the defect.  Even so, Defendants continued to market and sell the defective devices.

39.     Philips' admissions also flatly contradict the representations regarding the Subject Devices in Philips' catalogues and elsewhere, including the representation that the DreamStation BiPAP autoSV was "designed to deliver optimal ventilation with minimal intervention" and "designed to comfortably treat [apnea patients] by delivering therapy when it's needed to help them achieve a restful night's sleep."

40.     Philips also represented that its devices were "Clinically proven to help: • Reduce the frequency of obstructive and central events • Reduce AHI • Suppress Cheyne-Stokes respiration • Improve oxygenation • Improve quality of life."  Philips further represented that "Sleep labs and sleep techs trust Philips

CLASS ACTION COMPLAINT

Respironics over any other manufacturer for their Sleep Diagnostic equipment by
more than 3:1*"

41.    Further, Philips stated that "We believe that effective sleep therapy
management empowers patients to rediscover their dreams and to have the freedom
to live a fulfilling life by restoring their ability to sleep comfortably - as sleep is
intended to be. As a global leader in Sleep Diagnostic and Therapy solutions, we
are passionate about providing patient-driven designed products that help patients
lead healthy lives and, for providers, solutions designed to increase patient
adoption, long-term use and enhanced efficiencies that help them attend to
patient's needs."  Similarly, Philips represented that "our sleep therapy systems are
designed with the needs of practitioners and patients in mind.  These quality
systems reflect our commitment to providing exceptional therapy, enhanced patient
comfort, and essential compliance tools so important in today's challenging
environment."

42.    Moreover, the timing of the recall announcement is particularly
suspect, as Philips waited *until* the Dream Station 2 devices were released to
announce the recall.

CLASS ACTION COMPLAINT

43.     Further, on information and belief, in order to turn in their Devices for replacements under the recall, users are required to waive all personal injury claims as a condition of obtaining a replacement device.

44.     Philips' delayed announcement has also resulted in a massive shortage of replacement devices, as Class members are scurrying desperately to replace the Subject Devices with safe alternatives.

## PLAINTIFF'S EXPERIENCE

45.     Plaintiff has used a DreamStation BiPAP autoSV device for sleep apnea since at least May 2018. To date, he has paid $2,705.83 out of pocket for his device.

46.     In addition, Plaintiff has paid out of pocket for replacement filters and masks and cushions for his device.

47.     Plaintiff would not have paid any amounts in connection with his device, if he had known that the device was defective.  In addition, due to the admitted defect, Plaintiff's device is of diminished value, if not worthless.

## CLASS ALLEGATIONS

48.     Plaintiff brings this action on his own behalf, and on behalf of a Nationwide and Illinois Class (collectively, the "Class") pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3) as follows:

**Nationwide Class**:

All persons or entities in the United States who purchased or leased the Subject Devices.

**Illinois Class**:

All persons or entities in Illinois who purchased or leased the Subject Devices.

49.     Excluded from the Class is Philips, its affiliates, employees, officers and directors, persons or entities that purchased Subject Devices for resale, and the Judge(s) assigned to this case.  Also excluded are any claims for personal injury. Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

50.     The Class, as defined, includes all medical supply companies, nursing homes and other entities, as applicable.

51.     Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Philips and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that hundreds of thousands of Subject Devices machines have been sold in each of the States that are the subject of the Class.

52.    <u>Existence and Predominance of Common Questions of Fact and Law</u>:

Common questions of law and fact exist as to all members of the Class. These

questions predominate over the questions affecting individual Class members.

These common legal and factual questions include, but are not limited to whether

> a.  The Subject Devices were defective;
>
> b.  Philips knew of the Defect but failed to disclose the problem and its
>     consequences to its customers;
>
> c.  A reasonable consumer would consider the Defect or its consequences
>     to be material; and
>
> d.  Philips's conduct violates the Illinois Consumer Fraud and Deceptive
>     Business Practices Act and/or the Magnuson-Moss Act and constitutes
>     breach of warranty, strict liability and /or unjust enrichment.

53.    <u>Typicality</u>:  All of Plaintiff's claims are typical of the claims of the

Class since Plaintiff purchased a CPAP machine with the Defect, as did each

member of the Class.  Furthermore, Plaintiff and all members of the Class

sustained monetary and economic injuries including, but not limited to,

ascertainable losses arising out of Philips' wrongful conduct.  Plaintiff is

advancing the same claims and legal theories on behalf of himself and all absent

Class members.

54.     Adequacy:  Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

55.     Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Philips's conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Philips's sales records database of complaints.

## ESTOPPEL FROM PLEADING AND TOLLING
## OF APPLICABLE STATUTES OF LIMITATIONS

56.     Philips has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.  Defendant has possessed exclusive knowledge about the Defect, including from its customer complaint and warranty records, internal emails, reports, analyses, and assessment of engineers, that is unavailable to Plaintiff and the proposed Class Members. Philips is estopped from relying on any statutes of limitation or repose due to its acts of concealment. Defendant knew about the defect in the Subject Devices for years but concealed it and/or failed to alert purchasers or potential purchasers.

57.     Defendant maintained exclusive control over information concerning the known, but non-public, defect and the number of Subject Devices at issue; Plaintiff and Class Members, therefore, could not reasonably have known about the existence of the defect or the number of Subject Devices affected. Thus, Defendant is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## <u>COUNT ONE</u>

### Violations of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)

58.     Plaintiff, individually and for the Illinois Class, hereby incorporates each and every allegation as though fully set forth herein.

59.     Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

60.     Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

61.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ILCS") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

62.     In the course of its business, Philips knew and willfully failed to disclose and/proactively concealed the fact that its CPAP and ventilator devices contain polyester based polyurethane foam that degrades and can be inhaled by the users, causing health risks, including respiratory issues and cancer. Philips also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Subject Devices.

63.    Philips was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing Subject Devices throughout the State of Illinois that did not perform as advertised and jeopardized the safety of their users.

64.    By failing to disclose that the Subject Devices contain polyester based polyurethane foam that degrades and can be inhaled by the users, causing health risks, including respiratory issues and cancer, Philips engaged in deceptive business practices in violation of the ILCS.

65.    Philips' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true nature of the Subject Devices, the quality of the Philips brand and, and the devaluing of safety at Philips.

66.    Philips intentionally and knowingly omitted material facts regarding the Subject Devices with the intent to mislead Plaintiff and the Illinois Class.  By omitting this information, Philips intended Plaintiff and the Class to rely on the alleged deception and acquire and use the Subject Devices, despite the fact that

they are deceptive and unsafe.   Philips had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective Subject Devices.

67.     Philips' failure to disclose the safety problems with the Subject Devices is material because Plaintiff and the Class would not have purchased the Subject Devices if Philips had disclosed the devices' safety risks.  This is information upon which a buyer would be expected to rely on in making a decision whether to purchase the Subject Devices.

68.     Philips knew or should have known that its conduct violated the ILCS.

69.     The existence of the Defect was material to Plaintiff and the Illinois Class.

70.     Philips' violations present a continuing risk to Plaintiff and the Illinois Class members as well as to the general public. Philips' unlawful acts and practices complained of herein affect the public interest.

71.     Philips had an ongoing duty to all of its customers to refrain from unfair and deceptive practices under the ILCS. All owners of the Subject Devices suffered ascertainable loss from not obtaining the benefit of their bargains.

72.     As a direct and proximate result of GM's violations of the ILCS, Plaintiff and the Illinois Class have suffered injury-in-fact and/or actual damage in

paying to purchase the Subject Devices and/or in paying more for the Subject

Devices than they would have if they had known of the Defect. Class members

who purchased or leased the Subject Devices either would have paid less for their

devices or would not have purchased or leased them at all but for Philips' wrongful

conduct and violations of the ILCS.

73.     Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Illinois Class seek

monetary relief against Philips in the amount of actual damages.

74.     Plaintiff also seeks an order enjoining GM's unfair and/or deceptive

acts or practices, attorneys' fees, costs, and any other just and proper relief

available under the 815 ILCS 505/1 et seq.

75.     Therefore, Plaintiff prays for relief as set forth below.

## COUNT TWO
### Strict Product Liability

76.     Plaintiff, individually and for the Class, hereby incorporates each and

every allegation as though fully set forth herein.

77.     Plaintiff brings this claim for strict product liability design defect

against Philips on behalf of the Class.

78.     Philips is the producer, manufacturer, and/or distributor of the Subject

Devices.

79.     Philips' Subject Devices left Defendant's possession in an unreasonably dangerous condition.

80.     The Subject Devices, which, among other potential defects, contain polyester based polyurethane foam that degrades and can be inhaled by the users, causing health risks, including respiratory issues and cancer, were in an unreasonably dangerous condition because (a) they failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable to Philips; and (b) because the foreseeable risks of using the Subject Devices outweighed the benefits of their use.

81.     Plaintiff and the Class members used the products as intended and in a manner reasonably foreseeable to Philips.

82.     As direct and foreseeable result of the defective condition of the Subject Devices as produced, manufactured, and/or distributed by Philips, Plaintiff and the Class members suffered damages.

83.     Therefore, Plaintiff prays for relief as set forth below.

## COUNT THREE
### Unjust Enrichment

84.     Plaintiff, individually and for the Class, hereby incorporates each and every allegation as though fully set forth herein.

85.     Plaintiff brings this claim for unjust enrichment against Philips on behalf of the Class.

86.     As a direct, proximate, and foreseeable result of Philips' acts and otherwise wrongful conduct, Plaintiff and the Class members conferred a benefit on Philips and consequently suffered damages. Philips profited and benefited from the sale of the Subject Devices, even as the Devices caused Plaintiff and the Class members to incur damages. Philips voluntarily accepted and retained these profits and benefits, derived from Plaintiff and the Class members, with full knowledge and awareness that as a result of Philips' wrongdoing, consumers including Plaintiff and the Class members were not receiving products of the quality, nature, fitness, or value that had been represented by Philips or that reasonable consumers expected. Plaintiff and the Class members purchased or leased Subject Devices that they expected would be safe and instead have now had to endure serious injury, illness, hospitalization, and/or death.

87.     Philips continues to possess monies paid by Plaintiff and the Class members to which Philips is not entitled.

88.     Under the circumstances it would be inequitable for Philips to retain the benefits conferred upon them, and Philips' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

89.     Plaintiff and the Class members hereby seek the disgorgement and restitution of Philips' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Philips' unjust enrichment.

90.     Therefore, Plaintiff prays for relief as set forth below.

## COUNT FOUR
### Breach of Implied Warranty

91.     Plaintiff, individually and for the Class, hereby incorporates each and every allegation as though fully set forth herein.

92.     Philips manufactured, marketed, sold, and distributed the Subject Devices.

93.     At the time Philips marketed, sold, and distributed the Subject Devices, Philips knew of the purpose for which the Subject Devices were intended and impliedly warranted that the Subject Devices were of merchantable quality and safe and fit for such use.  In fact, the Subject Devices were unmerchantable in that they were not fit for the ordinary purpose for which the Subject Devices are used.

94.     Plaintiff and the Class members reasonably relied upon the skill, superior knowledge, and judgment of Philips as to whether the Subject Devices were of merchantable quality and safe and fit for their intended use.

95.     Plaintiff and the Class members could not have known about the risks associated with the Subject Devices until after use.

96.     Contrary to Philips' implied warranty, the Subject Devices were not of merchantable quality and were not safe or fit for their intended use.

97.     Plaintiff and Class members have had sufficient direct dealings with either Philips or its agents to establish privity of contract between Philips on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Philips and its dealers or authorized sellers or distributors.  Philips does business in Illinois through its authorized dealerships, and Plaintiff acquired his device from an authorized distributer who was an agent of Philips.  Philips' warranties are intended for consumers of the Subject Devices.  Plaintiff was the intended consumer of the Subject Device, and the warranty was intended to benefit the consumer.  The dealers, sellers or distributors were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Subject Devices; the warranty agreements were designed for and intended to benefit the consumers only.

98.     As a direct and proximate result of Philips' breach of implied warranty, Plaintiff and the Class members suffered damages as alleged herein.

99.     Notice to Defendant is not required because Philips actually knew about the alleged defect.  In fact, Philips' recall of the Subject Devices amounts to an admission of responsibility.

100.    Therefore, Plaintiff prays for relief as set forth below.

## COUNT FIVE
### Violation of the Magnuson-Moss Warranty Act 15 U.S.C. §§ 2301, *et seq.*

101.    Plaintiff, individually and for the Class, hereby incorporates each and every allegation as though fully set forth herein.

102.    Plaintiff and members of the Class are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

103.    Defendant Philips is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

104.    The Subject Devices are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

105.    Philips impliedly warranted that the Subject Devices would be free of defects at the time of delivery, and the Subject Devices had an implied warranty of merchantability.

106.   Philips breached its warranties by offering for sale and selling Subject Devices that were by design and construction defective and unsafe, thereby subjecting Class members who purchased or leased the Subject Devices to damages and risks of loss and injury.

107.   Philips has breached and continues to breach its written and implied warranties of safety, thereby damaging Plaintiff and similarly situated Class members, when their Subject Devices fail to perform as represented due to an undisclosed Defect.

108.   As a result of Philips' continued breach of its warranties, Plaintiff has suffered damages.

109.   Plaintiff and the Class seek full compensatory and consequential damages allowable by law, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Philips' wrongful acts and practices, restitution, attorney's fees and costs, and any other relief to which Plaintiff and the Class may be entitled.

110.   Therefore, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all those similarly situated, as set forth above, prays for relief and judgment against Defendant as

follows:

1.      Plaintiff, on behalf of himself, and members of the Class, requests the
Court to enter judgment against Defendant as follows:

(a)     An order certifying the proposed Class designating Plaintiff as
        named representative of the Class, and designating Plaintiff's
        Counsel as Class Counsel;

(b)     An order awarding Plaintiff and the Class Members injunctive and
        declaratory relief provided by and pursuant to the statutes cited
        above, including a declaration that Defendant's activities are
        unlawful and an order enjoining those activities and ensuring that
        Defendant develops and implements a full, far and complete plan for
        addressing Class members' concerns;

(c)     Entry of judgment against Defendant for the violations alleged
        herein;

(d)     An order awarding Plaintiff and Class Members compensatory,
        actual, statutory, consequential, and/or any other form of damages
        provided by and pursuant to the causes of action cited above;

(e)     An award of punitive damages;

(h)     An order awarding Plaintiff and the Class Members restitution,

CLASS ACTION COMPLAINT

disgorgement and/or other equitable relief provided by and pursuant to the causes of action cited above, including an order requiring specific performance of the Defendant's obligations;

(i)     An award to Plaintiff of the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees;

(j)     An order awarding Plaintiff and the Class Members pre- judgment and post judgment interest;

(k)     An award of such other and further relief as the Court may deem just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rules of Civil Procure, Rule 38(b), Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: June 29, 2021                    By: */s/ Daryl Andrews* _____

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
P.O. Box 67101
Chestnut Hill MA 02467
Telephone: (617) 999-6473
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

Jordan L. Lurie
Ari Y. Basser
POMERANTZ LLP
1100 Glendon Avenue
15th Floor
Los Angeles, CA 90024
Phone (310) 432-8492
jllurie@pomlaw.com
abasser@pomlaw.com

Peretz Bronstein, Esq.
BRONSTEIN GEWIRTZ & GROSSMAN LLC
60 East 42nd Street, Suite 4600
New York, NY 10165-0006
peretz@bgandg.com

CLASS ACTION COMPLAINT